Janice ROGERS, a Minor, age 16, Patricia Rogers, a Minor, age 15, by Their Mother and Next Friend, Mrs. Corine Rogers, Plaintiffs,

v.

Dr. Edgar F. PAUL, Dr. Roger Bost, John M. Yantis, Bruce Shaw, Jack Grober, Douglas G. Rogers, Board of Directors of Special School District of Fort Smith, Arkansas, Chris Corbin, Superintendent of Schools of Special School District of Fort Smith, Arkansas, Special School District of Fort Smith, Arkansas, a Corporation, Defendants.

No. 1741.

United States District Court
W. D. Arkansas,
Fort Smith Division.

Aug. 19, 1964.

George Howard, Jr., Pine Bluff, Ark., for plaintiffs.

Daily & Woods, Shaw, Jones & Shaw, Fort Smith, Ark., for defendants.

JOHN E. MILLER, Chief Judge.

On September 12, 1963, plaintiffs filed their complaint against the Directors and the Superintendent of the Special School District of Fort Smith, Arkansas, and against the District, in which they alleged that the defendants, and each of them, while acting in their official capacities have denied in the past, are now, and threaten to continue to deny to minor plaintiffs and the members of the class of persons that they represent, their rights, privileges and immunities as citizens of the United States and the State of Arkansas by engaging in the following:

"A. By maintaining and operating segregated public high schools within the Special School District of Fort Smith, Arkansas for minor plaintiffs and the members of the class of persons that they represent and assigning minor plaintiffs and the members of the class of persons that they represent to segregated public high schools in said district because of their race and color contrary and in violation of the equal protection and due process clauses of the Fourteenth Amendment to the federal Constitution; and,

"B. By maintaining and operating a dual scheme of attendance areas based solely on race with the assignment of high school pupils to schools in the district on the basis of their attendance areas in which they live, except that Negro high school pupils who do not reside in the Negro attendance area are required to attend the high school in the Negro attendance area, and the white high school pupils residing in

the Negro attendance are required to attend high school in a white attendance area, all of which violate the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution; and,

"C. By maintaining and approving of budgets making available funds, school construction programs and curricula designed to perpetuate and maintain compulsory racially segregated schools, all of which violate the Fourteenth Amendment to the Constitution of the United States; and,

"D. By the assignment of teachers, principals and other administrative personnel to the various high schools within the Special School District of Fort Smith, Arkansas on the basis of their race and color and on the basis of the race and color of the pupils, all of which is being done to the detriment of the plaintiffs and the members of the class of persons they represent and in violation of the Fourteenth Amendment to the Constitution of the United States."

That after conferring with defendants in an effort to persuade them to cease and discontinue the alleged unlawful and discriminatory practices, the minor plaintiffs tried to enroll at one of the white high schools in the District but were refused admission; that in June 1963 the plaintiffs invoked rights under the Arkansas Pupil Assignment Law by filing a written request for transfer from the all-Negro high school to the Northside white high school and requested a hearing before the Board; that "defendants have refused to enroll or admit minor plaintiffs to the Northside white school because of their race and color, contrary to and in violation of the equal protection and due process clauses of the Fourteenth Amendment to the Constitution of the United States."

That the minor plaintiffs, and each of them, and the members of the class of persons that they represent, have been and are now being greatly harmed, damaged and injured by the unlawful, wrongful and knowing acts of the defendants.

The prayer of the complaint is that the cause be advanced on the docket and be set for a speedy hearing; that a temporary injunction be issued to enjoin and restrain defendants from further denying and depriving minor plaintiffs, and the members of the class of persons that they represent of their rights, privileges and immunities as citizens of the United States, or the equal protection of the laws secured to them by the Constitution and laws of the United States on the basis or classification of race or color; that upon a final hearing the temporary injunction be made permanent, and that the defendants and their successors in office be enjoined and restrained "from assigning teachers, principals and other administrative personnel to the schools within the Special School District of Fort Smith, Arkansas, or any public school that is under the supervision or control of the defendants, on the basis of their race and color and on the basis of the race and color of the pupils in said district."

On October 7, 1963, defendants filed their joint answer, in which they specifically denied that they have discriminated against the plaintiffs or the class of persons whom plaintiffs represent, because of race and color.

The defendants incorporated in their answer a motion to strike sub sub-paragraph D of sub-paragraph 9 of paragraph IV of the complaint on the ground that the facts therein alleged are insufficient to state a claim upon which plaintiffs are entitled to or can be granted any relief.

Paragraph III of the answer is as follows:

"The defendants allege that on July 16, 1956, the defendants and their predecessors in office as members of the Board of Directors of the Special School District of Fort Smith, Arkansas, voluntarily and unanimously adopted a Plan of desegregation applicable to all of the schools administered and maintained by the Special School District of

Fort Smith, Arkansas, which Plan is enunciated and set forth in an exchange of letters from the then President of the Board of Directors of the Special School District of Fort Smith under date January 5, 1956, addressed to the attorney member of the then Board of Directors of the District, Mr. Owen C. Pearce to Mr. Frank Beckman, President of the Board of Directors of the Special School District of Fort Smith under date of April 30, 1956, copies of which two said letters embodying said Plan of desegregation are annexed to this Answer as Exhibits A and B hereto and made a part hereof to the same extent at this point as if copied in full in this Answer.

"Defendants further allege that said Plan of desegregation was placed in full effect by the defendants and their predecessors in office upon the commencement of the school term in September 1957, at which term the First Grade in all of the elementary schools administered and maintained by the defendants was fully desegregated under said Plan and at which time the defendants cancelled and voided all pre-existing separate geographical districts for white and Negro pupils applicable to the First Grade in all of the defendants' schools.

"Thereafter these defendants and their predecessors as members of the Board of Directors of the Special School District of Fort Smith have, each year at the commencement of the September term of the schools of the district, likewise desegregated the next highest grade in said schools and cancelled and voided all pre-existing separate geographical districts for white and Negro pupils applicable to each successive higher grade, thus progressing through September, 1963, to full desegregation through the Seventh Grade, abolishing all pre-existing separate geographical districts for white and Ne-

gro pupils applicable to Grades One to Seven inclusive.

"Defendants allege that said Plan is in full conformity with the decision of the United States Supreme Court in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083; is fully consistent therewith and with the test of 'all deliberate speed' prescribed in said decision under the facts and circumstances then and thereafter and now existing in the community served by the Special School District of Fort Smith; that the administration of said Plan by the defendants as above set forth is in conformity with and not violative of the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution as heretofore interpreted by the Supreme Court of the United States and other Courts of Appeal of the United States.

"That the plaintiffs and the class whom they represent have acquiesced in the administration of said Plan by the defendants as consistent with the equal protection and due process clauses of the Fourteenth Amendment to the Constitution of the United States, as interpreted by the courts of the United States, from its inception in 1957 down to the filing of this action.

"That said Plan, as voluntarily adopted and administered by the defendants and their predecessors in office, has proved workable, beneficial and non-discriminatory for all of the patrons of the Fort Smith Special School District and the inhabitants of the community which it serves, regardless of race or color.

"That said Plan is non-discriminatory on the basis of race or color upon its face and as in fact administered by the defendants from September, 1957, down to the present.

"That said Plan as so administered has fostered and promoted harmonious and peaceful relationships

between all pupils and patrons of the Fort Smith Special School District and citizens of the community which it serves during the entire period of its operation down to the present, and provides a vehicle by which a transition from a totally segregated to a totally desegregated school system can be accomplished with a minimum of administrative problems.

"That there still exist administrative problems of various natures involved in the continued transition from segregated schools to desegregated schools, some of which are peculiar to the presently remaining segregated grades Eight through Twelve, which grades the defendants in all good faith intend to continue to desegregate in accordance with the Plan, a grade each year; and a continuance of the Plan in its present form will foster the orderly, peaceful and harmonious solution of such administrative problems. Disruption or material alteration of the Plan at this stage of its progress will aggravate and accentuate the administrative problems confronting the defendants and peculiarly affecting the desegregation of grades Eight through Twelve, and will thereby cause a deterioration and down grading of the educational opportunities that can be afforded by the defendants to all of the patrons of the defendant District over the course of the next five years, to the detriment of all of the students of the defendant District, both Negro and white.

"That the progression of the Plan of desegregation, as adopted and placed in effect by the Special School District of Fort Smith, presently constitutes a desegregation with 'all deliberate speed', in compliance with the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution as interpreted and declared by the United States Courts."

The cause was set for trial on its merits on November 21, 1963, but it developed that facilities for holding court would not be available on that date, and the case was stricken from the trial calendar subject to resetting.

On June 2, 1964, the court fixed June 18, 1964, as the date for a pretrial conference to be held in the Circuit Court room in the Sebastian County Courthouse.

On June 13, 1964, the defendants filed an amendment to their answer in which they referred to the original plan of desegregation that had been voluntarily and unanimously adopted by the defendants and their predecessors and placed in operation upon the commencement of the school term in September 1957. In the amendment the defendants set forth the status of the program under the plan heretofore referred to as carried out in those schools, the attendance areas of which include both white and Negro pupils.

The plan under which the defendants were operating when this suit was filed provided in subsection (b) of numbered paragraph 2:

"No pupil whose race or color is in the minority in a given school should be required to attend that school. He should be allowed, but not required, to attend the school nearest his home in which his race or color predominates."

The defendants prayed in the amendment to their answer that "in the event the Court rules that the voluntary transfer provisions of the present plan of integration of Fort Smith Special School District and heretofore in effect since September 1957 be violative of any rights of the plaintiffs, that the Court grant the defendants reasonable time in which to promulgate and file with the Court and serve upon the plaintiffs a revised plan for the future continued integration of the schools in the Fort Smith Special School District eliminating therefrom the voluntary transfer provisions on the basis of race heretofore in effect; and pray otherwise as in their original Answer."

At the pretrial conference on June 18, 1964, the court held that the action heretofore taken under subsection (b) of numbered paragraph 2 (the voluntary transfer provision) of the original plan of integration is invalid, and that the defendants should have a reasonable time to prepare, serve and file a revised plan of integration. In accordance with such findings the defendants were ordered to prepare, serve and file with the court in a reasonable time a revised plan for the integration of the schools of Fort Smith Special School District.

Also, at the same hearing it was announced that Mr. William M. Eads, Jr., had succeeded the named defendant, Douglas G. Rogers, as a member of the Board of Directors, and the said Eads was substituted as a party defendant.

On July 17, 1964, the defendants in compliance with the pretrial order of June 18 filed and served the revised plan of integration. The plan filed by the defendants consists of nine typewritten pages. It was introduced into evidence, and it seems unnecessary to copy herein the entire plan, but reference will be made herein to the provisions of the proposed plan that are specifically objected to by the plaintiffs.

On July 28, 1964, the plaintiffs filed their response to the revised plan, in which they alleged that the revised plan and the initial plan, under which the defendants have heretofore operated the schools "do not represent a good faith and prompt effort to desegregate the Special School District of Fort Smith, Arkansas, with all deliberate speed within the meaning of the United States Supreme Court's Mandate in the Brown case." That the revised plan does not offer any benefits to the minor plaintiff, Patricia Rogers, who is now in the 11th grade; that the other named plaintiff, Janice Rogers, graduated from high school during the last school term and did not have an opportunity to enjoy the benefits to be derived from an integrated education,[1] and "if the court should countenance the delay which is advocated by defendants, which plaintiffs assert that defendants have not shown any necessity for such delay, this minor plaintiff also will be denied her rights to an integrated education." That the revised plan makes no provisions for the desegregation of the teaching and administrative personnel in the schools within the Special School District of Fort Smith, Arkansas, all in violation of the Fourteenth Amendment to the United States Constitution. "That the Lincoln attendance area under the proposed reorganization will still be based solely on race, all in violation of the federal Constitution."

The cause was tried to the court on August 10, 1964. The defendant, Chris Corbin, Superintendent of Schools of the Special School District of Fort Smith, Arkansas, called as a witness by defendants, testified at length. By agreement the original plan of integration, appearing as Exhibit A to the original answer and which became effective with the beginning of the school term in September 1957, and the proposed revised plan filed herein on July 17, 1964, were introduced into evidence together with maps of the proposed attendance areas under the proposed and revised plan.

The plaintiffs also called Mr. Corbin as a witness and introduced Exhibits 1 through 8, but it seems unnecessary to set forth such exhibits for the reason that in the opinion of the court they are not helpful in determining the issues raised by the pleadings and the proposed revised plan and the objections of the plaintiffs thereto. These exhibits were introduced by plaintiffs in support of sub-paragraph 9–C of paragraph IV of the specific allegations of the complaint, but they in nowise tend to establish that the defendants have been maintaining and approving budgets making available funds, school construction programs and curricula designed to perpetuate and

---

1. Plaintiff Janice Rogers is now enrolled in the Fort Smith Junior College, a completely integrated college.

maintain compulsory racially segregated schools.

The plaintiffs also called as witnesses S. E. Bullock, Principal of Lincoln High School, and the plaintiffs Mrs. Corine Rogers and Miss Patricia Rogers. The plaintiff Mrs. Corine Rogers, mother of Miss Patricia Rogers, testified that she would like for her daughter to be "exposed to an integrated education." The daughter testified that she would like to attend an integrated high school because Negroes are now in competition with white people as well as with Negroes, and she felt that she would have a better chance to succeed by graduating from an integrated high school.

There are 30 schools situate in the defendant District and operated by the defendant Directors. In the school year 1963–64 there was a total of slightly more than 14,000 pupils residing in the District. The average daily attendance of Negro pupils was 1,082 while the average daily attendance of white pupils was 11,423.

The school population prior to World War II had remained practically static for several years, but increased rapidly in the decade of 1940 to 1950. In 1948 the defendant District found it necessary to engage in a huge building program, which program is now practically completed, and all the new buildings will be in operation with the beginning of the school year 1964–65. The District plans to demolish the old Washington elementary school building which has heretofore been attended exclusively by Negroes. The building is antiquated and the other buildings are in excellent condition and the facilities are ample. Under the revised plan the students formerly attending will be transferred to other schools that are predominantly white and located in the attendance area of the residence of the pupils.

At the end of the school year 1962–63 the elementary grades, 1 through 6, had been integrated according to the original plan. At the beginning of the school year 1963–64, the 7th grade was integrated in accordance with the original plan. In the defendant District the elementary grades include 1 through 6, the junior high schools include grades 7 through 9, and the senior high schools include grades 10 through 12.

During the 1963–64 school year white and Negro pupils availed themselves of the provisions for voluntary transfer contained in the original plan heretofore set forth, and the record discloses that a total of 323 white pupils voluntarily transferred from schools to which they had been assigned situated in their residential areas to various other schools. During the same time 214 Negro pupils transferred from schools located in their residential areas to other schools that were predominantly Negro. Only 39 Negro pupils were enrolled and attended a predominantly white school during that school year, and no white pupils were enrolled or attended a school that was predominantly Negro. If the original plan had not contained the voluntary transfer provision, there would have been approximately 170 Negro pupils required to attend schools that were predominantly white and approximately 100 white students would have been required to attend schools that were predominantly Negro.

It will be observed from statements heretofore made that the pupils of both races availed themselves of the provisions of the original plan for voluntary transfer. It seems clear that the great majority of pupils, white and Negro, do not desire to attend an integrated school.

On June 3, 1963, the Supreme Court handed down the opinion in Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632, in which the court held that similar voluntary transfer provisions in a plan were void and unconstitutional. The court, in discussing the transfer provision under consideration in that case, beginning at page 686 of 373 U.S., at page 1408 of 83 S.Ct., said:

"It is readily apparent that the transfer system proposed lends itself to perpetuation of segregation. Indeed, the provisions can work only

toward that end. While transfers are available to those who choose to attend school where their race is in the majority, there is no provision whereby a student might transfer upon request to a school in which his race is in a minority, unless he qualifies for a 'good cause' transfer. As the Superintendent of Davidson County's schools agreed, the effect of the racial transfer plan was 'to permit a child [or his parents] to choose segregation outside of his zone but not to choose integration outside of his zone.' Here the right of transfer, which operates solely on the basis of a racial classification, is a one-way ticket leading to but one destination, i. e., the majority race of the transferee and continued segregation. This Court has decided that state-imposed separation in public schools is inherently unequal and results in discrimination in violation of the Fourteenth Amendment. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Our task then is to decide whether these transfer provisions are likewise unconstitutional. In doing so, we note that if the transfer provisions were made available to all students regardless of their race and regardless as well of the racial composition of the school to which he requested transfer we would have an entirely different case. Pupils could then at their option (or that of their parents) choose, entirely free of any imposed racial considerations, to remain in the school of their zone or to transfer to another."

At page 689 of 373 U.S., at page 1409 of 83 S.Ct. the court said:

" \* \* \* The transfer provisions here cannot be deemed to be reasonably designed to meet legitimate local problems, and therefore do not meet the requirements of Brown. Accordingly, the decisions of the Court of Appeals, insofar as they approve the transfer provisions submitted by the boards of education of Knoxville, Tennessee, and Davidson County, Tennessee, are reversed and the cases are remanded to the Court of Appeals with directions to remand to the District Courts for further proceedings in accordance with this opinion."

When that decision was announced the defendant Directors began consideration of an amendment to their integration plan under which the schools had been operated since the beginning of the school term in 1957. On September 9, 1963, three months and six days after the release of the opinion in the Goss case, the plaintiffs commenced the instant action. As a result of the order of this court entered June 18, 1964, the defendants asked and were granted permission to serve and file a plan for integration as a substitute for the original plan. In the revised plan the defendant Board of Directors stated that their predecessors announced in 1956 their intention to integrate the District schools in accordance with the Brown decision. The Board at that time recognized that there were a number of factors that were required to be taken into consideration in arriving at a satisfactory solution of the problem and in formulating a plan for integration agreeable to constitutional principles. In the revised plan the defendants stated:

"This Board recognizes that these same elements must still, in varying degrees, be taken into account in revising the present plan. A revised plan must meet the mandate of the courts as laid down in later decisions.

"The Board reaffirms its former position to endeavor to effect a constitutional solution of the problem. As a part of its revised plan of integration it re-adopts the policies that it used as a basis for the original approach to the matter in 1956. Inasmuch as any revised plan must take into account the progress that has already been made, and inasmuch as the sufficiency of a revised

plan must be determined in the light of the experience heretofore gained, the Board feels that the original declaration of the Board establishing the policy and Plan of Integration should be re-stated and incorporated into this revision:"

Then follows a restatement of the policy, and after restating such policy the defendants set forth that subsequent decisions of the Supreme Court and other appellate courts require a modification of the present plan of integration, but that these modifications do not require that the policy of the Board be changed inasmuch as the announced policy on integration is consistent with and broad enough to be a basis of a revised plan that will in the judgment of the Board be adequate. Continuing the defendants said:

"As a result of the original Plan of Integration the Special School District of Fort Smith, Arkansas, will enter the eighth year of its plan for voluntary integration at the beginning of the 1964–65 school year. In accordance with this present plan of voluntary integration grades 1 through 8 will be integrated at the beginning of the 1964–65 school term. The Revised Plan of the Board provides to continue to integrate the school system one grade at a time as it has heretofore done."

The Board of Directors then deals with the schools in the "elementary level" and in the "secondary level." Without doubt, in a District the size of the defendant District the most approved and efficient plan calls for a division of the schools in what school men term the "6–3–3" plan of operation, which is to say that the first six grades should be classified as elementary, the next three grades as junior high, and the last three grades as senior high. The revised plan clearly outlines the changes necessary to put such a classification in effect, and it is necessary to create new junior high school attendance areas in order to take full advantage of the new system and as required by the huge building program

hereinbefore referred to. The plan further provides:

"Under the revised plan of integration the Board will continue to integrate at the secondary level one grade at a time. During the 1964–65 school year grade eight will be integrated at the junior high school level. This will result in 197 Negro pupils being integrated in previously all white junior high schools.

"Complying with the Court's direction, the Board directs the discontinuancce of the practice of voluntary transfer as provided in the original plan of integration. Any transfer either voluntary or involuntary of a pupil from one secondary school district to another must be done hereafter for reasons that appear adequate to the administration, which reasons are neither based upon nor influenced by race or color."

The plaintiffs contend that the revised plan of integration and defendants' initial plan of integration "do not represent a good faith and prompt effort to desegregate the Special School District of Fort Smith, Arkansas, with all deliberate speed within the meaning of the United States Supreme Court's Mandate in the Brown case." They also argue that there has been too much deliberation and not enough speed.

When the actions of the School Board from 1956 to the present time are considered, along with the many decisions of the Supreme Court and the appellate courts, it is difficult for this writer to understand why such contentions would be made. There have been and is now an exceptionally harmonious and cooperative relationship between the races in Fort Smith, Arkansas. Integration is an accomplished fact, and certainly the School District, acting through its Directors, made "a prompt and reasonable start towards compliance with the Brown decision."

In Brown v. Board of Education, (1955) 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, the court, beginning at page

300 of 349 U.S., at page 756 of 75 S.Ct., said:

"* * * Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system."

The plaintiffs cited and seem to rely upon the case of Watson v. City of Memphis (1963) 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529, in their broadside assault upon the revised plan, but the court, beginning at page 531 of 373 U.S., at page 1318 of 83 S.Ct., said:

"This case presents no obvious occasion for the application of Brown. We are not here confronted with attempted desegregation of a local school system with any or all of the perhaps uniquely attendant problems, administrative and other, specified in the second Brown decision as proper considerations in weighing the need for further delay in vindicating the Fourteenth Amendment rights of petitioners. Desegregation of parks and other recreational facilities does not present the same kinds of cognizable difficulties inhering in elimination of racial classification in schools, at which attendance is compulsory, the adequacy of teachers and facilities crucial, and questions of geographic assignment often of major significance."

In Aaron v. Cooper, (8 Cir. 1957) 243 F.2d 361, the court had under consideration a judgment of the District Court for the Eastern District of Arkansas, 143 F.Supp. 855 (1956), in which the District Court approved a plan of integration promulgated and adopted by the Board of Directors of the Little Rock School District. The trial court at page 864 of 143 F.Supp. said:

"* * * The primary responsibility for the implementation of the constitutional principles announced in the May 17, 1954, decision, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, is upon the school authorities. It is the duty of the school authorities to solve the many and varied local problems. Because of the nature of the problems and the local conditions the school authorities often find that action taken by other school districts is inapplicable to the facts with which they are dealing. It is not the duty or function of the federal courts to regulate or take over and operate the public schools. That is still the duty of the duly state-created school authorities, but the free public schools must be maintained and operated as a racially nondiscriminatory system. During the period of transition from a segregated to a nonsegregated system the school authorities must exercise good faith. They must consider the personal rights of all qualified persons to be admitted to the free public schools as soon as practicable on a nondiscriminatory basis. The public interest must be considered along with all the facts and conditions prevalent in the school district. Educational standards should not be lowered. If the school authorities have acted and are proceeding in good faith, their actions should not be set aside by a court so long as

their action is consistent with the ultimate establishment of a nondiscriminatory school system at the earliest practicable date."

The Court of Appeals, in affirming the judgment of the District Court, beginning at page 363 of 243 F.2d, said:

"Appellants cite to us several cases where Federal Courts have used their injunctive powers to speed up or effectuate integration. Willis v. Walker, D.C.W.D.Ky.1955, 136 F. Supp. 177; Thompson v. County School Board of Arlington County, D.C.E.D.Va.1956, 144 F.Supp. 239; Clemons v. Board of Education, 6 Cir., 1956, 228 F.2d 853, certiorari denied 1956, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868; Booker v. State of Tennessee Board of Education, 6 Cir., 1957, 240 F.2d 689. These decisions serve only to demonstrate that local school problems are 'varied' as referred to by the Supreme Court. A reasonable amount of time to effect complete integration in the schools of Little Rock, Arkansas, may be unreasonable in St. Louis, Missouri, or Washington, D. C. The schools of Little Rock have been on a completely segregated basis since their creation in 1870. That fact, plus local problems as to facilities, teacher personnel, the creation of teachable groups, the establishment of the proper curriculum in desegregated schools and at the same time the maintenance of standards of quality in an educational program may make the situation at Little Rock, Arkansas, a problem that is entirely different from that in many other places. It was on the basis of such 'varied' school problems that the Supreme Court in the second Brown decision remanded the cases there involved to the local District Courts to determine whether the school authorities, who possessed the primary responsibility, have acted in good faith, made a prompt and reasonable start, and whether or not additional time was necessary to accomplish complete desegregation. The question of speed was to be decided with reference to existing local conditions."

Throughout the proposed revised plan the Board refers only to elementary and secondary schools for the reason that the "6–3–3" program cannot be inaugurated and effectively followed until there have been some necessary changes made, as set forth in the provisions of the revised plan, and in discussing those revisions the Board has referred to both junior high and senior high as schools of the secondary level, but when the revised plan is in operation, the Board states:

"In order to accomplish reorganization of the secondary schools the Board has established a transition period during the 1964–65 school year. Northside High School will house grades 10, 11 and 12. Southside Junior-Senior High School will house grades 9, 10 and 11 during the transition year. Lincoln will include grades 9, 10, 11 and 12 during the school year 1964–65 and 10, 11 and 12 beginning with the school year 1965–66."

The plaintiffs made no contention as to the provisions of the revised plan which provides that in the interest of maintaining and insuring "quality education for all pupils" that the revised plan, insofar as the Howard Elementary School, the Dunbar Elementary School and the Washington Elementary School are concerned, shall not apply until the beginning of the school year 1965–66 for the reasons set forth in numbered paragraph 3–A, B and C of the revised plan.

The plaintiffs further contend that the revised plan is unconstitutional because under it teachers, principals and other administrative personnel of the high schools may be assigned on the basis of their race and color and on the basis of the race and color of the pupils which will be to the detriment of the plaintiffs and the members of the class of persons they represent.

In this connection, the defendants in their original answer filed October 7,

1963, moved to strike sub-paragraph 9–D of Paragraph IV, which is the paragraph where the plaintiffs voice their objection to the plan because of the manner of providing for the assignment of teachers and other administrative personnel.

The court in the pretrial conference stated that the sub-paragraph would not be stricken for the reason that it might become material and require consideration if the question was raised by proper parties, and relying upon Mapp v. Board of Education of City of Chattanooga (6 Cir. 1963) 319 F.2d 571, the court sustained an objection to the introduction of evidence by plaintiffs on the question of the assignment of teachers, but in order to avoid a multiplicity of suits, the court will retain jurisdiction of the case in order that the question may be raised if any proper party desires to intervene.

At the close of the introduction of testimony the plaintiffs orally moved the court that they should recover their costs and a reasonable attorney's fee, and in support thereof have cited to the court the case of Bell v. School Board of Powhatan County, Va., (4 Cir. 1963) 321 F.2d 494; Local No. 149 I. U., U. A., A. & A. I. W. v. American Brake Shoe Co., (4 Cir. 1962) 298 F.2d 212; Rolax v. Atlantic Coast Line R. Co., (4 Cir. 1951) 186 F.2d 473; and Buckner v. County School Board of Green County, (4 Cir. 1964) 332 F.2d 452.

■ The court has examined all of the cases relied upon by plaintiffs in support of their motion for allowance of attorney's fees. In Bell, supra, the court, in considering the question of allowance of attorney's fees in a school integration case, announced what this court believes to be the correct rule at page 500 of 321 F.2d:

" * * * The general rule is that the award of counsel fees lies within the sound discretion of the trial court but, like other exercises of judicial discretion, it is subject to review. The matter must be judged in the perspective of all the surrounding circumstances. Local 149, U. A. W. v. American Brake Shoe Co., 298

F.2d 212 (4th Cir.), cert. denied, 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1962). Here we must take into account the long continued pattern of evasion and obstruction which included not only the defendants' unyielding refusal to take any initiative, thus casting a heavy burden on the children and their parents, but their interposing a variety of administrative obstacles to thwart the valid wishes of the plaintiffs for a desegregated education. To put it plainly, such tactics would in any other context be instantly recognized as discreditable. The equitable remedy would be far from complete, and justice would not be attained, if reasonable counsel fees were not awarded in a case so extreme. See Rolax v. Atlantic Coast Line R. Co., 186 F.2d 473, 481 (4th Cir. 1951) (Parker, C. J.) ; cf. Vaughan v. Atkinson, 369 U.S. 527, 530–531, 82 S. Ct. 997, 8 L.Ed.2d 88 (1962)."

■ Certainly the facts in the instant case do not justify the allowance of an attorney's fee to the plaintiffs, and therefore their motion should be overruled.

The facts reflect that the Directors and administrators of the school affairs of the defendant District have since 1956 been diligent in their efforts to integrate the schools as required by the decisions of the courts. The administration of the plan has been eminently successful and satisfactory. It has been accepted by the majority of pupils and parents as the best method of complying in good faith with the law. When the defendants discovered that the voluntary transfer provisions in the original plan was unconstitutional, they began to do something about it. Prior to the decision in the Goss case, the defendants were moving with all deliberate speed to make some necessary changes in the attendance areas in order to utilize all the facilities of the District and to guarantee every child of school age the full enjoyment of his or her constitutional rights. In order to insure the attainment of that objective a plan had to be followed. It has

been followed for seven years, and under the proposed revised plan full and complete integration will be accomplished, and in order to insure such a result and the full implementation of the constitutional principles, the Directors and school authorities should not be deprived of the exercise of their sound discretion in the discharge of their primary responsibility for "assessing and solving the problems that confront them."

 The revised plan should be approved, and judgment is being entered today, approving and confirming the revised plan as filed herein on July 17, 1964; retaining jurisdiction of the cause for a decision of any question that might arise as to the assignment of teachers and principals, but not to any other personnel, if presented by proper parties; dismissing the complaint of the plaintiffs except as to sub-paragraph 9–D of paragraph IV; and providing that the parties hereto shall pay their own costs.